United States District Court
Southern District of Texas

**ENTERED**

June 03, 2026

Nathan Ochsner, Clerk

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| Plaintiff, | § | |
| v. | § | CRIMINAL ACTION NO. H-26-23 |
| | § | |
| JOHN STEVENSON BYNON, JR., | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM AND OPINION**

A grand jury indicted Dr. John Stevenson Bynon, Jr., an experienced transplant surgeon, for making false statements in connection with a health-care benefit program, in violation of 18 U.S.C. § 1035. (Docket Entry No. 1). The United States alleges that Dr. Bynon falsely stated on the United Network of Organ Sharing's donor-matching system that his patients needed organs from donors of unrealistic age and weight criteria; for example, by stating that his adult patients needed organs from donors whose age and weight criteria would be met only by small, obese children. (*See id.* ¶¶ 12–19; Docket Entry No. 29 at 4). The United States alleges that Dr. Bynon's false statements manipulated the donor-matching system to make his patients "either severely restricted or functionally ineligible to receive a donor organ offer," (Docket Entry No. 1 ¶ 12), while their criteria were adjusted.

Dr. Bynon has filed several pretrial motions in response to the indictment: (1) a motion to dismiss; (2) a motion to strike certain allegations; and (3) a motion to suppress evidence obtained from a search of his cell phone. (Docket Entry Nos. 29, 30, 33). The United States opposes the

motions to dismiss and to strike but concedes that it will not use evidence obtained either directly or indirectly from the search of Dr. Bynon's cell phone.  (Docket Entry Nos. 37, 38, 39, 49).

Based on the motions, the responses, the replies, a careful review of the record, the applicable law, and with the benefit of oral argument, the motion to dismiss, (Docket Entry No. 29), is denied; the motion to strike certain allegations, (Docket Entry No. 33), is denied, but the court enters a limine order as to the content of those allegations; and the motion to suppress, (Docket Entry No. 30), is denied as moot.  The reasons for these rulings are set forth in detail below.

## I.    Background

In 1984, Congress passed the National Organ Transplant Act, establishing the Organ Procurement and Transplant Network.  (Docket Entry No. 1 ¶ 5).  Congress directed the Transplant Network to maintain a national registry for organ matching and to contract with a private organization to operate the network.  (*Id.*).  The Transplant Network awarded the contract to the United Network of Organ Sharing ("UNOS"), which has operated the national registry since its inception.  (*Id.*).  UNOS is "responsible for managing the national transplant waiting list, matching potential transplant donors and recipients, maintaining the database that contains all organ transplant data for every transplant that occurs in the United States, [and] ensuring that patients receive a fair chance at receiving organ[s] they need without regard for age, sex, ethnicity, religion, [or] financial/social status . . . ."  (*Id.* ¶ 6).

UNOS created UNet, a technological platform to help match organ donors and potential recipients.  (*Id.* ¶ 7).  UNet includes a "Waitlist" identifying individuals in need of organ transplants; a "DonorNet" identifying organ donors; a "TransNet" designed to match donors and recipients correctly and efficiently; and other technologies, such as the Transplant Information

Electronic Data Interchange, to help find compatible matches between donors and transplant recipients.  (*Id.*).

UNet's matching systems rely on patient medical data.  (*Id.* ¶ 8).  UNet's matching system includes facts about a patient's immunological system and "donor matching criteria," such as the size and weight of a donor.  (*Id.*).  "These parameters contribute to the ability of the transplant recipient to be matched with a transplant donor and therefore the likelihood of a successful transplant."  (*Id.*).

John Stevenson Bynon, Jr., was a Houston physician licensed to practice medicine in Texas.  (*Id.* ¶ 10).  Dr. Bynon was the Director of Abdominal Organ Transplantation and the Surgical Director for Liver Transplantation of Memorial Hermann Health System's Texas Medical Center.  (*Id.*).  He served as the Texas Medical Center's primary surgeon for the liver program in the Transplant Network.  (*Id.*).

The United States alleges that Dr. Bynon "entered false donor matching criteria" in five patients' "medical records within UNet."  (*Id.* ¶ 12; *see also id.* ¶¶ 13, 15, 17, 19).  The United States alleges that by entering false donor-matching criteria, Dr. Bynon made his patients "either severely restricted or functionally ineligible to receive a donor organ offer" through UNet's matching system.  (*Id.* ¶ 12; *see also id.* ¶¶ 13, 15, 17, 19).

A grand jury indicted Dr. Bynon for five counts of making false statements relating to health-care matters, in violation of 18 U.S.C. § 1035, as shown in the following table:

| Count | Date | Patient | Description | Nature of Falsity |
|---|---|---|---|---|
| 1 | March 22, 2023 – February 14, 2024 | C.C. | Medical Record | Donor matching criteria |
| 2 | February 13, 2024 – March 23, 2024 | A.P. | Medical Record | Donor matching criteria |
| 3 | February 10, 2023 – December 22, 2023 | R.O. | Medical Record | Donor matching criteria |
| 4 | April 25, 2023 – March 26, 2024 | P.P. | Medical Record | Donor matching criteria |
| 5 | December 23, 2023 – December 24, 2023 | O.F. | Medical Record | Donor matching criteria |

(*Id.* at 8).

Dr. Bynon moved (1) to dismiss the indictment; (2) to strike certain allegations from it; and (3) to suppress evidence obtained from a search of his cell phone. (Docket Entry Nos. 29, 30, 33). The United States opposed the motions but conceded that it will not use evidence obtained from the search of Dr. Bynon's cell phone. (Docket Entry Nos. 37, 38, 39). Dr. Bynon replied that the motion to suppress was not moot because the United States did not foreclose using evidence obtained indirectly from the cell-phone search. (Docket Entry No. 45). After the court ordered a response, (Docket Entry No. 47), the United States confirmed that it would not use evidence obtained directly or indirectly from the search of Dr. Bynon's cell phone, (Docket Entry No. 49).

On June 1, 2026, the court heard oral argument on the pending motions. The parties confirmed that the motion to suppress, (Docket Entry No. 30), is moot. The remaining motions are ready for ruling.

## II.    The Legal Standards

### A.    The Motion to Dismiss

A criminal defendant may move to dismiss based on a "defect in the indictment," such as a "failure to state an offense." FED. R. CRIM. P. 12(b)(3)(B)(v). Generally, "[i]n deciding a motion to dismiss, the court must accept the allegations in the indictment as true and determine whether

the defendant is entitled to the requested relief as a matter of law." *United States v. Cuellar*, 800 F. Supp. 3d 716, 727 (S.D. Tex. 2025) (citing *United States v. Mann*, 517 F.2d 259, 266–67 (5th Cir. 1975)).   The Fifth Circuit also allows district courts to use a summary-judgment-like procedure on a motion to dismiss a criminal case.[1]  A "district court may make preliminary findings of fact necessary to decide the questions of law presented by pre-trial motions so long as the court's findings on the motion do not invade the province of the ultimate finder of fact." *United States v. Flores*, 404 F.3d 320, 324 n.6 (5th Cir. 2005) (quoting *United States v. Shortt Acct. Corp.*, 785 F.2d 1448, 1452 (9th Cir. 1986)).  This "approach avoids the waste of judicial resources that results from 'legally meritless cases being sent to trial.'" *Id.* at 325 (quoting *United States v. Salman*, 378 F.3d 1266, 1269 (11th Cir. 2004)).  A legal defense is ready for ruling on a motion to dismiss "if trial of the facts surrounding the commission of the alleged offense would be of no assistance in determining the validity of the defense." *Id.* (quoting *United States v. Covington*, 395 U.S. 57, 60 (1969)).

### B.       The Motion to Strike

Allegations in an indictment that are unnecessary to prove the crime charged and that are "irrelevant, inflammatory, and prejudicial" may be stricken as surplusage. *United States v. Graves*, 5 F.3d 1546, 1550 (5th Cir. 1993); *see* FED. R. CRIM. P. 7(d); *United States v. Miller*, 471 U.S. 130, 136–37 (1985).  The standard is strict.  Courts "rarely grant [ ] such a motion." *United States v. Solomon*, 273 F.3d 1108, at *1 (5th Cir. 2001) (first citing *United States v. Bullock*, 451 F.2d

---

[1] The United States argues that "[t]here is no such thing as a motion for summary judgment in a criminal case." (Docket Entry No. 37 at 4).  The United States attributed this quote from the dissent, *see Russell v. United States*, 369 U.S. 749, 791 (1962) (Harlan, J., dissenting), as a majority holding.  A 60-year-old dissent, even from Justice Harlan, is not particularly helpful.

884, 888 (5th Cir. 1971); and then citing *United States v. Oakar*, 111 F.3d 146, 157 (D.C. Cir. 1997)).

When an allegation in an indictment is "sufficiently relevant to the charged offense, the court should not strike it, no matter how prejudicial it may be." *Solomon*, 273 F.3d 1108, at *1; *United States v. Scarpa*, 913 F.2d 993, 1013 (2d Cir. 1990). The issue of whether "to strike language from the indictment is separate from the issue of whether the indictment should be redacted before it is given to the jury." *United States v. Fisch*, No. Crim. H-11-722, 2015 WL 128090, at *5 (S.D. Tex. Jan. 8, 2015) (citing *United States v. Harriston*, 329 F.3d 779, 792 (11th Cir. 2003)).

### III.    The Motion to Dismiss

The United States alleges that Dr. Bynon made materially false statements in connection with the delivery of or payment for health care under a health care benefit program, in violation of 18 U.S.C. § 1035(a). That statute provides:

> (a) Whoever, in any matter involving a health care benefit program, knowingly and willfully—
>
> > (1) falsifies, conceals, or covers up by any trick, scheme, or device a material fact; or
> >
> > (2) makes any materially false, fictitious, or fraudulent statements or representations, or makes or uses any materially false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry,
> >
> > > in connection with the delivery of or payment for health care benefits, items, or services, shall be fined under this title or imprisoned not more than 5 years, or both.

18 U.S.C. § 1035(a). To prove a § 1035(a) violation, the United States must prove beyond a reasonable doubt that: "(1) the defendant made a materially false, fictitious, or fraudulent statement or misrepresentation; (2) in connection with the delivery of [or payment for] health care benefits;

6

and (3) he did so knowingly and willfully." *United States v. Dailey*, 868 F.3d 322, 330 (5th Cir. 2017) (alterations in original).

Dr. Bynon argues that the indictment does not allege a violation of the statute for three reasons: (1) adjusting patients' donor acceptance criteria does not make a statement or assert a fact that is capable of being true or false, (Docket Entry No. 29 at 10–11 (citing *Williams v. United States*, 458 U.S. 279, 284 (1982)); (2) the adjustments do not involve a health care benefit program, (*see id.* at 13–14); and (3) adjusting patients' donor criteria is not "in connection with the delivery of or payment for health care benefits," (*see id.* at 14–15). In addition, Dr. Bynon argues that this prosecution violates the Fifth Amendment's Due Process Clause because the United States is prosecuting him for following UNOS guidance and industry practice and for relying on his own medical judgment about the best interests of his patients. (*Id.* at 15–19).

### A.    The Statute's Elements

#### 1.    False Statements and Representations

Dr. Bynon argues that a violation of § 1035 requires proof beyond a reasonable doubt that: "(1) the defendant made a statement, and (2) that statement can be characterized as 'false' and not 'true.'" *Thompson v. United States*, 604 U.S. 408, 416 (2025). Dr. Bynon's threshold argument is that adjusting his patients' donor-acceptance criteria did not make a statement or representation that is capable of being true or false. (Docket Entry No. 29 at 10–11; Docket Entry No. 44 at 11–14). Dr. Bynon argues that adjusting a patient's donor criteria on a donor-matching service simply prevents that patient from receiving donor offers until the criteria are reset and does not communicate any facts capable of being true or false about that patient. He compares his conduct to listing a home or piece of art for sale at an absurdly high price, which he believes are acts that do not state or represent to buyers the true value of the home or piece of art. (*See* Docket Entry

No. 29 at 12 n.19; Docket Entry No. 44 at 8–9).  Because the court cannot resolve the legal issue Dr. Bynon raises without a "trial of the facts surrounding the commission of the alleged offense," *Flores*, 404 F.3d at 325 (quoting *Covington*, 395 U.S. at 60), pretrial dismissal is inappropriate.

Whether an act makes a statement or representation capable of being true or false is fact dependent.  The relevant precedent begins with *Williams v. United States*.  The Supreme Court held that a defendant who deposited several checks from accounts with insufficient funds to cover the checks did not make a false statement within the meaning of 18 U.S.C. § 1014.  *Williams*, 458 U.S. at 283–84.  The United States had secured a conviction on the theory that by depositing the bad checks, the defendant had falsely represented that the accounts had enough money to cover the checks.  *Id.* at 283.  The Court reversed "because the defendant's course of conduct did not involve the making of a false statement for the simple reason that a check is not a factual assertion at all, and therefore cannot be characterized as true or false." *Thompson*, 604 U.S. at 816 (internal quotations omitted) (quoting *Williams*, 458 U.S. at 284).

The Court gave two reasons for its conclusion.  First, the bad checks were documents with independent legal significance.[2]  "Each check did not, in terms, make any representation as to the state of petitioner's bank balance." *Williams*, 458 U.S. at 284–85.  Instead, "the value legally placed upon them was the value of petitioner's [payment] obligation; as defined by Louisiana law, that is the only meaning actually attributable to a bank check." *Id.* at 285.  Second, the Court declined to adopt a "subjective and variable" "general understanding of a check's function." *Id.* at 286.  The Court rejected the argument that by returning a guilty verdict, the jury had found that

---

[2] There is a close connection between the Court's interpretation of "statement," *Williams*, 458 U.S. at 284 (quoting 18 U.S.C. § 1014), and the evidence rule that a document with independent legal significance, such as a contract, check, or offer, is not a "statement" subject to the rules against hearsay, FED. R. EVID. 801(a).  *See* Richard A. Lloret, *Assertion and Hearsay*, 125 Dick. L. Rev. 347, 367 & nn.86–90 (2021) (making this connection and collecting examples).

the defendant had implicitly represented that he "currently has funds on deposit sufficient to cover the face value of the check." *Id.* at 285. The Court explained that there is no "immediately clear . . . 'common understanding'" of "the implied representation of the act of depositing one's own check." *Id.* at 286 n.7. Depositing a check could represent that, at that moment, the drawer has enough funds to cover the check; or represent that the drawer "will have sufficient funds deposited in his account by the time the check clears"; or represent that "that the drawer will make good the face value of the draft if it is dishonored by the bank." *Id.* The Court held that the implied-representation theory rested on a "fragile foundation" of factual inferences that could not sustain the conviction, as a matter of law. *Id.*

*Williams* has not been limited to its facts, but courts have been wary of extending it. Courts have applied to *Williams* to other criminal allegations that documents or verbal acts with independent legal significance were false statements. In *United States v. Blankenship*, the Eleventh Circuit held that "a contract is not a factual assertion, and therefore cannot be characterized as 'true' or 'false.'" 382 F.3d 1110, 1135 (11th Cir. 2004). "Just as a check gives its recipient the legal right to payment either from the bank or the drawer, so too a contract gives the other party the legal right either to performance or compensation." *Id.* And just as "a check, by its terms, does not 'make any representations as to the state of petitioner's bank balance,' a contract does not make any representations as to a party's intention to perform instead of paying damages, or to exercise its rights under the contract." *Id.* (quoting *Williams*, 458 U.S. at 284–85). The Eleventh Circuit emphasized that contract law recognizes the theory of "efficient breach" because it is sometimes rational and preferable for parties to breach rather than perform their contracts. *See id.* at 1133–34. The court concluded that Congress did not intend to criminalize contract breaches through a false-statement statute. *See id.* at 1136.

9

Although the logic of *Williams* drove the Eleventh Circuit's conclusion in *Blankenship*, the court relied on *Williams* only after explaining why no other facts in the case could support a conviction. The *Blankenship* court recognized that a contract can be false if a person forges or materially alters it. If a contract is forged or altered, then, "[l]ike [a] forged birth certificate or counterfeit currency, the document itself would be, quite literally, false." *Id.* at 1132 (first citing *United States v. Holley*, 826 F.2d 331 (5th Cir. 1987); and then citing *United States v. Voorhees*, 593 F.2d 346, 349 (8th Cir. 1979)). A contract may contain "several affirmative statements of fact that [are] blatantly untrue," such as false recitals. *Id.* at 1332–33 (citing *United States v. Jespersen*, 65 F.3d 993 (2d Cir. 1995)). A contract may communicate an implied false statement if it is signed or submitted under circumstances that show its falsity, such as a "false guarantee[] made on [an] application[] for government benefits or programs." *Id.* at 1133 (first citing *Elmore v. United States*, 267 F.2d 595, 603 (4th Cir. 1959), and then citing *Corcoran v. United States*, 229 F.2d 295 (5th Cir. 1956)); *cf. Universal Health Servs., Inc. v. United States ex. rel. Escobar*, 579 U.S. 176, 186–87 (2016) (an "implied false certification" may make a claim for reimbursement "false or fraudulent"). The Eleventh Circuit's thorough treatment of the case law makes clear that *Williams* applies, but only in the proper context. *See United States v. Shah*, 44 F.3d 285, 291 (5th Cir. 1995) (cautioning that "*Williams* must be considered in context").

*United States v. Waechter*, 771 F.2d 974 (6th Cir. 1985), on which Dr. Bynon relies, (Docket Entry No. 44 at 3–4), is illustrative. In *Waechter*, the United States "alleged that Waechter's practice of having employees submit multiple bids for a single property, in a manner that did not reveal that Waechter controlled all the bids, constituted false statements because Waechter intended to withdraw any bid except the lowest bid necessary to outbid his competitors and enable him to purchase a house." *Id.* at 975. A jury convicted Waechter, but the Sixth Circuit

10

reversed.  *Id.*  The Sixth Circuit canvassed the ways in which a written statement can be true or false.  There may be an "express factual assertion" that is "an affirmative statement"; an "omission of information expressly sought by a document" that "is combined with a signature certifying the completeness or truthfulness of the information provided in the document"; or an implied factual assertion under "the system of statutes, regulations, and announced policies which created the document" or statement.  *Id.* at 978–79.  The Sixth Circuit explained that *Williams* was a failed attempt to secure a conviction under this final category of false statements.  *See id.* at 979.

Based on *Williams* and relevant precedents, the Sixth Circuit asked whether, after "viewing the evidence in the light most favorable to the government," "a jury could conclude beyond a reasonable doubt that at least one bid placed with HUD on behalf of Waechter expressly or impliedly asserted a factual proposition that was false."  *Id.*  The Sixth Circuit held that no reasonable jury could do so.  First, the "bids placed on behalf of Waechter contained no express affirmative false statements" because they did not state that the bidders were acting only on their own behalf.  Second, "the bids did not make express false statements by omission" because the "bid forms did not seek any of the information" needed to make the alleged statement true or false.  Finally, the bids did not make implied false statements because the relevant HUD policies "did not prohibit a person from using agents to place bids on one's behalf as an undisclosed principal," require a person to disclose the use of multiple agents or aliases, or "prohibit a person from withdrawing a bid for any reason or no reason."  *Id.* at 979–80.  To the extent the bids implied factual assertions, the implied assertions were true.  *See id.*  The court cautioned that "Waechter's method of bidding may not have been legal" under other statutes and that "his conduct certainly [did] not merit ethical approval."  *Id.*  The court concluded that the United States did not carry its burden under the statute on which the grand jury indicted Waechter.  *Id.*  The Sixth Circuit did not

11

"allow the government to convict Waechter of being a bad person, engaging in sharp practices, or of discovering a loophole in HUD's policies." *Id.* at 980.

Dr. Bynon argues that undisputed facts that can be judicially noticed compel a ruling in his favor. (*See* Docket Entry No. 29 at 10–13; Docket Entry No. 44 at 3–9). But each of the *Williams* rulings on which Dr. Bynon relies issued after a conviction. *See, e.g.*, *Williams*, 458 U.S. at 280; *Blankenship*, 382 F.3d at 1116; *Waechter*, 771 F.2d at 980. Although the court can make preliminary factual findings on a motion to dismiss, *Flores*, 404 F.3d at 324 n.6, a motion to dismiss in a criminal case does not impose on the government a burden of production before trial, *see United States v. Ambers*, 416 F.2d 942, 943 (5th Cir. 1969) (a motion to dismiss an indictment is not the proper vehicle to raise a sufficiency-of-the-evidence challenge). The parties continue to gather information that may be presented as evidence at trial. For example, the court recently issued a subpoena, at Dr. Bynon's request, for additional documents relating to UNOS policies and procedures about donor-acceptance criteria and internal holds. (Docket Entry Nos. 51, 52). There is no procedural mechanism to close the factual record before the United States rests its case at trial.

To the extent Dr. Bynon argues that no additional evidence could change the meaning (or lack thereof) of a donor-acceptance-criteria adjustment, the court is not persuaded. Dr. Bynon argues that altering a patient's donor-acceptance criteria does not make a factual statement but merely anticipatorily rejects donor offers. (*See* Docket Entry No. 44 at 5 (citing UNOS, UNet Offer Filters, https://unos.org/technology/offer-filters/ (last visited May 18, 2026))). Such rejections are not statements, according to Dr. Bynon, but are instead acts similar to a "homeowner who wishes to avoid receiving offers on his or her home [by] placing the price so high that no buyer will make an offer," (Docket Entry No. 29 at 12 n.19), or an artist who offers his art for sale

12

at a price so high that no one would purchase it, (Docket Entry No. 44 at 8). But Dr. Bynon's argument does not foreclose proof that by offering to sell a home or an artwork at a certain price, the sellers implicitly made a false statement about the value of the home or artwork. *See Shah*, 44 F.3d at 294 ("[A] promise may amount to a 'false, fictitious or fraudulent' statement if it is made without any present intention of performance and under circumstances such that it plainly, albeit implicitly, represents the present existence of an intent to perform."). If a homeowner lists a home, or an artist offers to sell a work, on a platform that requires list prices to accurately reflect the value of what is offered, then offering an inaccurate price could be a false statement. Similarly, if UNOS requires doctors to set donor-acceptance criteria that accurately reflect their patients' medical needs, then Dr. Bynon's inaccurate donor-acceptance criteria for specific patients, which allegedly sought child donors, could be a false statement about those patients, all of whom were adults.[3]

The UNOS COVID-19 guidance on which Dr. Bynon relies illustrates the point. The guidance instructed doctors to "set the acceptable donor age acceptance criteria to 98 years (minimum) and 99 years (maximum)" if the doctor decides that their "individual transplant candidates should not receive organ offers . . . due to issues relating to COVID-19." (Docket Entry No. 53 at 66). In light of this guidance, a doctor setting the donor-acceptance criteria "to 98 years (minimum) and 99 years (maximum)" communicates to UNOS that the doctor's "individual

---

[3] Dr. Bynon argues that the United States is "stuck in its erroneous belief that Dr. Bynon made factual representations about his *patients* in UNet when he adjusted *donor* criteria." (Docket Entry No. 44 at 4 n.4). But a statement about potential donors can communicate facts about the potential recipient. If a doctor sets the donor criteria to require liver donors, the doctor's actions may imply that the patient is ill in a way that requires a new liver. In some contexts, the doctor's actions may not support such a "clear" "implied representation." *See Williams*, 458 U.S. at 286 n.7; *see also Shah*, 44 F.3d at 294. For example, a traveler who filters an Expedia search to "5-star hotels" may not clearly state that he or she plans to book a 5-star hotel; the traveler may just be browsing. So too for a coin collector perusing eBay. Because the issue is contextual, it is not amenable to resolution on a motion to dismiss.

transplant candidates should not receive organ offers . . . due to issues relating to COVID-19." (*Id.*). Under the "announced policies," the donor-acceptance-criteria adjustments communicate the "factual assertion[]" that, due to COVID-19 or some other reason, the patient is not healthy enough—at least at the time—for an organ transplant. *See Waechter*, 771 F.2d at 979. The parties will likely present evidence at trial about the UNOS guidance, policies, and donor-acceptance criteria and how Dr. Bynon and other professionals applied them. (*See* Docket Entry Nos. 51, 52, 53, 55). The court cannot make preliminary findings and conclusions about core trial disputes, especially on an incomplete record. *See Flores*, 404 F.3d at 324 n.6. Dr. Bynon may, of course, raise the issue again after the United States presents its evidence at trial, or after evidence is closed, or after the jury returns its verdict. *See* FED. R. CRIM. P. 29(a)–(b).

Dr. Bynon's fallback argument—that if the donor-acceptance criteria communicate anything, they communicate a medical judgment that is also incapable of being true or false, (Docket Entry No. 29 at 12)—also does not support pretrial dismissal. Dr. Bynon is correct that "a doctor may not be convicted of fraud for mere mistaken judgments or good-faith efforts to treat patients to the best of his ability." *United States v. Paulus*, 894 F.3d 267, 277 (6th Cir. 2018) (citing *United States v. Persaud*, 866 F.3d 371, 380 (6th Cir. 2017)); *see United States v. AseraCare, Inc.*, 938 F.3d 1278, 1297 (11th Cir. 2019) ("A properly formed and sincerely held clinical judgment is not untrue even if a different physician later contends that the judgment is wrong."). "[A] sincere statement of pure opinion is not an 'untrue statement of material fact.'" *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 186 (2015). But an opinion typically conveys at least one fact that can be proven false: "that the speaker actually holds the stated belief." *Id.* at 184. For example, "a CEO's statement about product quality ('I believe our TVs have the highest resolution available on the market') would be an untrue

14

statement of fact—namely, the fact of her own belief—if she knew that her company's TVs only placed second." *Id.*

By setting donor-acceptance criteria for a particular patient, a doctor may state an opinion about what organ donors are medically appropriate for that patient at that time.  That opinion could be false if the doctor did not subjectively believe that the selected donor-acceptance criteria were medically appropriate.  *See United States v. Mesquias*, 29 F.4th 276, 282 (5th Cir. 2022) (explaining that "facts inconsistent with doctors' proper exercise of their clinical judgment" can support a fraud conviction); *cf. United States v. Patel*, 485 F. App'x 702, 707 (5th Cir. 2012) (per curiam) (holding that a conviction based in part on the allegation that procedures were medically unnecessary did not violate due process because the defendant had a subjective understanding of medical necessity that the relevant procedures did not meet).  The United States may try to prove that Dr. Bynon made a false statement with evidence showing that: (1) by setting the donor-acceptance criteria, Dr. Bynon stated an opinion "that his adult-aged patients actually needed the organs of a small child" when (2) he did not subjectively believe that opinion to be true.  (Docket Entry No. 43 at 8 n.2).   Or the United States may try to prove that: (1) the donor-acceptance criteria communicated that Dr. Bynon believed "his patients were not healthy enough to accept a transplant" when (2) he knew or thought they were "healthy enough to do so."  (*Id.* at 9 n.3). Although Dr. Bynon's medical judgments are largely insulated from § 1035 liability, narrow triable factual issues remain.

For these reasons, the court denies Dr. Bynon's motion to dismiss the indictment because he did not make a false statement.[4]

---

[4] At oral argument, Dr. Bynon raised the issue that the United States's trial brief argues that Dr. Bynon hid the donor-acceptance-criteria adjustments from his patients and colleagues.  (Docket Entry No. 53 at 13–

### 2.   A Matter Involving a Health Care Benefit Program

The United States must prove that Dr. Bynon made a false statement in a "matter involving a health care benefit program."  18 U.S.C. § 1035(a).  A "health care benefit program" means:

> any public or private plan or contract, affecting commerce, under which any medical benefit, item, or service is provided to any individual, and includes any individual or entity who is providing a medical benefit, item, or service for which payment may be made under the plan or contract.

*Id.* § 24(b); *see id.* § 1035(b) (adopting the definition of "health care benefit program" in 18 U.S.C. § 24).  Dr. Bynon argues that UNOS is "a private non-profit organization that matches donated organs with patients" but "does not provide medical benefits, items, or services to any individual pursuant to a healthcare plan or contract."  (Docket Entry No. 44 at 9–10).  Dr. Bynon's argument fails because the indictment alleges that this case "involv[es]" two health care benefit programs.  18 U.S.C. § 1035(a); *see Involve*, American Heritage Dictionary (5th ed. 2022) ("relat[ing] to or affect[ing]"); *Involve*, Oxford English Dictionary Online (last visited June 1, 2026) ("[t]o include," "to contain," or "to be concerned or associated with"); *see also Allied-Bruce Terminix Companies, Inc. v. Dobson*, 513 U.S. 265, 274 (1995) ("The dictionary finds instances in which 'involve' and 'affect' sometimes can mean about the same thing." (quoting V Oxford English Dictionary 466 (1st ed. 1933))).

First, as all parties agree, Medicare is a health care benefit program, and Medicare paid the alleged victims' medical expenses.  (Docket Entry No. 1 ¶ 2; Docket Entry No. 29 at 13).  Second, the indictment alleges that UNOS's organ-donor matching system is a health care benefit program.

---

15).  The United States's trial brief is unclear on whether the United States is raising these facts (1) as atmospherics to show that Dr. Bynon's conduct is morally blameworthy; (2) to show that Dr. Bynon's alleged statements through donor-acceptance-criteria adjustments were false, and willfully so; or (3) to show that Dr. Bynon violated § 1035 through separate false statements or omissions to his patients and colleagues.  If the United States's trial brief falls into buckets 1 or 2, the evidence is not relevant to the motion to dismiss.  If the United States's trial brief falls into bucket 3, then additional motion practice may be needed to address whether this potentially new theory can proceed to trial.

16

The indictment alleges a "contract" between the Transplant Network and UNOS to operate "a national registry for organ matching." (Docket Entry No. 1 ¶¶ 5–6). Under that contract, UNOS provides a "medical benefit" or "service" to "any individual" who needs an organ by helping facilitate a match with a donor. *See United States v. Anderson*, 822 F. App'x 271, 276 (5th Cir. 2020) (per curiam) (holding that Blue Cross was a "health care benefit program" in part because it was under contract to "make available its network of providers").[5] Both Medicare and UNOS meet the "broad" statutory definition of a "health care benefit program." *See id.*

The indictment adequately alleges a "matter involving a health care benefit program." 18 U.S.C. § 1035(a).

### 3.    The Delivery of or Payment for Health Care Benefits, Items, or Services

The United States must prove that Dr. Bynon made a false statement "in connection with the delivery of or payment for health care benefits, items, or services." 18 U.S.C. § 1035(a). Dr. Bynon argues that the indictment does not satisfy this element because it alleges only that the donor-acceptance criteria made the patients ineligible to receive organ donations while the criteria were changed. (Docket Entry No. 29 at 14–15; Docket Entry No. 44 at 10). Ineligibility, in Dr. Bynon's view, is the "opposite of facilitating delivery of or payment for health care benefits." (Docket Entry No. 44 at 10). The court does not find Dr. Bynon's argument persuasive.

---

[5] Dr. Bynon raises in passing the fact that "health care benefit program" is a jurisdictional element because it must "affect[] commerce." (Docket Entry No. 29 at 14). The Fifth Circuit has interpreted § 24(b)'s "affecting commerce" language capaciously. *See, e.g.*, *United States v. Ogba*, 526 F.3d 214, 238 (5th Cir. 2008) ("The provision of medical services affects interstate commerce because both physicians and hospitals serve nonresident patients and receive reimbursement through Medicare payments, and the regulated activity in this case substantially affects commerce, and is linked to interstate commerce." (cleaned up)). Dr. Bynon does not clearly argue that UNOS does not affect commerce within the meaning of § 24(b). The court will not rule on the issue. *See ODonnell v. Harris County*, 808 F. Supp. 3d 738, 755 n.4 (S.D. Tex. 2025); *In re Container Store Grp.*, Inc., 676 B.R. 356, 388 (S.D. Tex. 2026).

The operative term in the statute is "in connection with."  The term is undefined, so Congress adopted its "ordinary meaning." *Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 566 (2012).  "Connection" is a "capacious term." *United States v. Am. Com. Lines*, L.L.C., 875 F.3d 170, 175 (5th Cir. 2017) (defining "in connection with" under 33 U.S.C. § 2703(a)(3)); *see also Mont v. United States*, 587 U.S. 514, 521–22 (2019).  It means a "relationship or association in thought (as of cause and effect, logical sequence, mutual dependence or involvement)," Webster's Third New International Dictionary 481 (2002), or "[t]he condition of being related to something else by a bond of interdependence, causality, logical sequence, coherence, or the like; relation between things one of which is bound up with, or involved in, another," 3 Oxford English Dictionary 747 (2d ed. 1989).  The term encompasses "things that are logically or causally related or simply 'bound up' with one another." *Am. Com.*, 875 F.3d at 175.

In the easiest case, a connection exists when there is a direct causal relationship: a second thing is connected to a first thing if the second thing "would not have occurred but for" the first thing. *Id.*  But a connection can exist "even if the connection is 'indirect'" or "even without a 'strict causal relationship.'" *Chevron USA Inc. v. Plaquemines Par.*, 146 S. Ct. 1052, 1060 (2026) (first quoting *Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 139 (1990); and then quoting *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 592 U.S. 351, 362 (2021)).[6]  Common sense and statutory context provide the primary limit on the term's scope: "in connection with" is "not so capacious as to be rendered meaningless." *Am. Com.*, 875 F.3d at 175; *see Plaquemines*, 146 S. Ct. at 1060 ("The ordinary meaning of 'relating to,' however, is not so broad that it is meaningless." (cleaned

---

[6] In *Plaquemines*, the Supreme Court interpreted the term "relating to," not "in connection with."  146 S. Ct. at 1060.  But the Court's adopted definition of "relating to" included the term "in connection with," so the court treats *Plaquemines* as highly persuasive. *See id.* ("It means to stand in some relation; to have bearing or concern; to pertain; refer; to bring into association with or connection with." (cleaned up)); *FERC v. Elec. Power Supply Ass'n*, 577 U.S. 260, 278 (2016) ("in connection with" and "related to" are "similar terms").

18

up)).  Connections that are attenuated, tenuous, remote, or peripheral will not fall under the statute. *See Plaquemines*, 146 S. Ct. at 1061.  An ordinary person would not "understand the fluttering of a butterfly's wings to" connect to "the next week's weather."  *Id.* (citing Edward N. Lorenz, Predictability: Does the Flap of a Butterfly's Wings in Brazil Set Off a Tornado in Texas?, at the American Association for the Advancement of Science (Dec. 29, 1972)); *see, e.g.*, *Maracich v. Spears*, 570 U.S. 48, 61 (2013).

This case does not test the outer limits of "in connection with."  The indictment alleges a causal connection between Dr. Bynon's donor-acceptance-criteria adjustments and the (non)delivery of and (non)payment for medical services.  Because Dr. Bynon adjusted his patients' donor-acceptance criteria, his patients were "either severely restricted or functionally ineligible to receive a donor organ offer" while the adjustments were in effect.  (Docket Entry No. 1 ¶ 12).  Dr. Bynon's patients' "would not have" been ineligible or restricted for organ donations "but for" Dr. Bynon's alleged false statements.  *Am. Com.*, 875 F.3d at 175.  There is a logical and causal connection between Dr. Bynon's alleged statements and whether and when his patients received certain medical services or benefits.

Dr. Bynon's argument that Congress enacted a one-way street covering only acts or statements that cause the delivery of medical services, rather than acts or statements that prevent the delivery of medical services, does not find support in the statute's text.  A reasonable person could find that there is a connection between a false statement and the delivery of medical services when the false statement prevents those medical services from being delivered.  *See id.* (requiring only a causal or logical relationship).  Dr. Bynon relies heavily on legislative history that suggests Congress was most concerned with false claims for payment or reimbursement to public or private insurers.  (*See* Docket Entry No. 29 at 14–15; Docket Entry No. 44 at 10–11).  "But statutory

prohibitions often go beyond the principal evil to cover reasonably comparable evils, and it is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 79 (1998); *see United States v. Hood*, 343 U.S. 148, 150 (1952) ("As is not uncommon in criminal legislation, Congress, in order to strike at the root, made the scope of the statute wider than the immediate evil.").

The indictment adequately alleges that Dr. Bynon made a false statement "in connection with the delivery of or payment for health care benefits, items, or services." 18 U.S.C. § 1035(a).

### B.    The Due Process Clause

The Fifth Amendment provides that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law." U.S. CONST. amend V.  The clause imposes on Congress a "fair warning requirement." *United States v. Lanier*, 520 U.S. 259, 266 (1997).  The Due Process Clause "bars enforcement of 'a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application.'" *Id.* (quoting *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391 (1926)).  It instructs courts to resolve "ambiguity in a criminal statute as to apply it only to conduct clearly covered." *Id.*  And it prevents "courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope." *Id.* The ultimate question "is whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal." *Id.* at 267.

Dr. Bynon argues that the indictment charges violate these principles because he participated in a "widespread practice" and exercised his "medical judgment." (Docket Entry No. 29 at 16–19).  He argues that there is no "prior judicial decision," "official guidance," "regulatory

notice," or "other governing source" that stated that his conduct "(endorsed by the transplant system's own governing body) was criminally proscribed." (Docket Entry No. 44 at 13).

Dr. Bynon's arguments do not warrant pretrial dismissal because they rely on disputed factual issues. The United States disputes that internal holds are widespread, that Dr. Bynon complied with the stated policy of internal holds, and that Dr. Bynon's use of internal holds reflected appropriate medical judgment. (Docket Entry Nos. 37, 53). Dr. Bynon has vigorously contested the United States's assessment of the facts and the inferences to draw from them. (Docket Entry Nos. 44, 55).

Taking the indictment allegations as true for the purposes of this motion, its charges do not violate the Due Process Clause. The Fifth Amendment prohibits novel statutory constructions, *Lanier*, 520 U.S. at 266, not novel prosecutions. "Due process is not . . . violated simply because the issue is a matter of first impression." *Ponnapula v. Spitzer*, 297 F.3d 172, 183 (2d Cir. 2002) (first citing *United States v. Kinzler*, 55 F.3d 70, 74 (2d Cir. 1995); and then citing *Moskal v. United States*, 498 U.S. 103, 108 (1990)). A "novel fact pattern alone does not invoke the rule of lenity." *United States v. Suchowolski*, 838 F.3d 530, 534 (5th Cir. 2016) (citing *United States v. Shabani*, 513 U.S. 10, 17 (1994)). Courts "may apply a statute to novel conduct so long as the plain text permits." *United States v. Pacilio*, 85 F.4th 450, 460 (7th Cir. 2023). The United States violates due process when it relies on a "construction of a criminal statute [that] is 'unexpected and indefensible by reference to the law which had been expressed prior to the conduct in issue.'" *Bouie v. City of Columbia*, 378 U.S. 347, 354 (1964) (quoting Jerome Hall, General Principles of Criminal Law 61 (2d ed. 1960)).

The present record does not show that the prosecution crosses that threshold. Section 1035 has distinct elements, clear terms, and enforceable limits. The court has used well-defined legal

21

principles to interpret the "plain text" of the statute and apply its meaning to the allegations in the indictment. *Pacilio*, 85 F.4th at 460; *see Suchowolski*, 838 F.3d at 534. To the extent the United States's allegations potentially pose fair-notice concerns—for example, by criminalizing bona fide medical opinions, *see Patel*, 485 F. App'x at 707—the court has identified relevant, pre-existing case law that shows how the indictment allegations do not transgress the Due Process Clause's boundaries. *See Omnicare*, 575 U.S. at 184 (explaining that an opinion can be false if the person who states the opinion does not subjectively hold it); *see also Paulus*, 894 F.3d at 277; *AseraCare*, 938 F.3d at 1297. The court's "interpretation of the statute" does not "create traps" for health-care professionals. *Snyder v. United States*, 603 U.S. 1, 15 (2024); *see also Pacilio*, 85 F.4th at 460 (finding no notice issues because "the wire and commodities fraud statutes" had "long been held to encompass" implied representations and misleading omissions).

Dr. Bynon's arguments are not that § 1035 now means something new. It is that he is being prosecuted for: (1) medical judgments that he does not think are statements under the statute; and (2) following guidance that he alleges UNOS, and competent transplant professionals, generally followed. In his words, "[c]riminal liability cannot attach to conduct that the private entities chosen by the Government to help implement organ transplants had affirmatively endorsed at the time of the conduct." (Docket Entry No. 44 at 12).[7] Dr. Bynon highlights that, under the United States's theory, tens of thousands of doctors who followed UNOS's guidance and industry practice are federal felons and that UNOS is a criminal enterprise because it conspired with or aided and abetted transplant professionals across the country. (Docket Entry No. 44 at 6, 12; Docket Entry

---

[7] Notice issues occur if a prosecution contradicts earlier guidance from federal government agencies that permitted the alleged misconduct. *See United States v. Moss*, 872 F.3d 304, 315 (5th Cir. 2017). But Dr. Bynon offers no authority for the proposition that this principle extends to guidance from government contractors.

No. 55 at 3). Those arguments may have traction, but on this record, they do not show a due process violation.

Criminal liability can attach to accepted industry practice. *See Smith v. United States*, 188 F.2d 969, 970 (9th Cir. 1951) ("Custom, involving criminality, cannot justify a criminal act."); *United States v. Brookshire*, 514 F.2d 786, 789 (10th Cir. 1975) ("[C]ustom and usage involving criminality do not defeat a prosecution for violation of a federal criminal statute."); *Newton v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.*, 135 F.3d 266, 274 (3d Cir. 1998) ("Even a universal industry practice may still be fraudulent."). But industry practice is often relevant to a defendant's mens rea. For example, in *United States v. Riley*, the United States argued that a district court appropriately excluded evidence of industry practice condoning the activity that the jury found was fraudulent. *See* 550 F.2d 233, 236 (5th Cir. 1977). The Fifth Circuit accepted as a general matter that "practice is not an absolute defense to criminality," but it reversed the defendant's conviction because evidence of the practice was crucial to showing that he acted without the requisite intent to injure and defraud. *See id.* at 236–38. Dr. Bynon's ability to use UNOS guidance and industry practice to argue that he did not knowingly and willfully make a false statement abates his fair-notice concern. *See Wooden v. United States*, 595 U.S. 360, 378–79 (2022) (Kavanaugh, J., concurring) (explaining that a "fair notice" defense may be needed "if a federal criminal statute does not contain a 'willfulness' requirement"); *United States v. Gonzalez*, 857 F.3d 46, 54 (1st Cir. 2017) ("Generally, criminal statutes provide that notice by including an element of mens rea . . . ."); *United States v. Crow*, 504 F. App'x 285, 287 (5th Cir. 2012) (per curiam) ("The requirement that a defendant act willfully or purposefully largely vitiates the objection that a statute criminalizes conduct a defendant did not know was wrongful.").

In addition, the court cannot conclude on the indictment allegations that the possible implications of the prosecution's theory for other health-care professionals pose due-process issues. Although courts should be wary of interpreting federal statutes to criminalize commonplace conduct, *see Snyder*, 603 U.S. at 14–17, § 1035 is unlikely to criminalize the conduct that Dr. Bynon argues is commonplace. Language is contextual. *See Thompson*, 604 U.S. at 419–20 (Alito, J., concurring). When many people consistently use words or actions to communicate a particular fact or concept, those words or actions take on that meaning. In this case, the jury will hear evidence of the context and practice surrounding Dr. Bynon's conduct. If the evidence shows that "adjusting" donor criteria to put a temporary internal hold on a transplant recipient is as widespread as Dr. Bynon claims, then the evidence may show that there is a unique contextual meaning to what otherwise could be a literal statement (or no statement at all) about what organ donations a patient needs. *See Highland Cap. Mgmt., L.P. v. Bank of Am., N.A.*, 574 F. App'x 486, 489 (5th Cir. 2014) ("Industry custom . . . helps the trier of fact to understand the meaning of the words used."). The evidence could then show that, under custom and practice, Dr. Bynon and other transplant professionals made statements that were true to those in the industry, even if they were false (or meaningless) to a wide audience that does not understand the relevant context. (*See* Docket Entry No. 43 at 7–8). In such a case, no criminal liability would attach to Dr. Bynon, other transplant professionals, or UNOS.

For these reasons, the prosecution does not violate the Due Process Clause.

## IV.    The Motion to Strike

Dr. Bynon has moved to strike the allegations in the indictment that some of his patients died or suffered adverse health events after he adjusted their donor-acceptance criteria to delay their receipt of a transplant; that some patients obtained transplants at other hospitals after being

reactivated from the waitlist; and that he made certain medical decisions unilaterally. (Docket Entry No. 33 at 2–3 (citing Docket Entry No. 1 ¶¶ 6–8, 12–19, 21)). The United States concedes in response that some of these allegations, such as those about the patient deaths, are prejudicial and inflammatory but nonetheless contends that the court should not strike them because they are at least minimally relevant to a violation of § 1035. (Docket Entry No. 39 at 1).

The allegations of the deaths or adverse health events of Dr. Bynon's patients are sufficiently relevant to survive the motion to strike. As discussed, the trial evidence may show that Dr. Bynon, through an internal hold, impliedly stated that his patients were not healthy enough to accept a transplant at that point. (*See* Docket Entry No. 43 at 8). The medical condition of his patients may then become relevant. (*See id.* at 9 n.3). Evidence that Dr. Bynon's patients died after he placed them on an internal hold may make it "more . . . probable" that they were too sick to receive a transplant when Dr. Bynon adjusted the donor criteria to put his patients on an internal hold until they were strong enough for the procedure. FED. R. EVID. 401(a). These facts may tend to prove that Dr. Bynon did not make a false statement. But under Rule 403, the probative value of evidence of the patients' deaths or adverse health events is substantially outweighed by its prejudicial impact, unless and until a party opens the door to such evidence.

The allegations that some of Dr. Bynon's patients subsequently received transplants at other hospitals may be sufficiently relevant to survive the motion to strike, but this is less clear. Evidence that some patients, at some time later, received a transplant is barely probative on whether they were too sick to receive a transplant at the time when Dr. Bynon adjusted the donor criteria to preclude a donor match. But under Rule 403, the probative value of evidence of the patients' subsequent transplants is substantially outweighed by its prejudicial impact, confusion of

the issues, and undue delay through minitrials on the patients' health after they left Dr. Bynon's care, unless and until a party opens the door to such evidence.

The allegations that Dr. Bynon deviated from customary practice by unilaterally acting to effectively preclude donor offers for certain patients by adjusting the donor criteria, rather than first consulting with other hospital transplant professionals about his patients' ability to accept offers from potential organ donors, could show that he thought his actions were improper. *Cf. Mesquias*, 29 F.4th at 282. But under Rule 403, the probative value of evidence that Dr. Bynon unilaterally made certain medical decisions about a number of patients, each with a long and complicated medical history, is substantially outweighed by its prejudicial impact, confusion of the issues, and undue delay through the presentation of patient-specific minitrials, unless and until a party opens the door to such evidence.

The appropriate step at this point is to enter a limine order precluding counsel, the parties, and witnesses from mentioning the patients' subsequent adverse health events, transplants, or deaths, and evidence that Dr. Bynon made certain medical decisions unilaterally, without first approaching the bench outside the venire's or the jury's presence and obtaining leave to do so. Whether the jury should have an unredacted version of the indictment that includes these allegations depends on what evidence the jury has heard during the trial. *See Fisch*, 2015 WL 128090, at *5 (citing *Harriston*, 329 F.3d at 792).

Dr. Bynon's motion to strike, (Docket Entry No. 33), is denied at this time.

26

**V.      Conclusion**

For these reasons, the motion to dismiss, (Docket Entry No. 29), is denied; the motion to strike, (Docket Entry No. 33), is denied but a limine order is entered; and the motion to suppress, (Docket Entry No. 30), is denied as moot.

SIGNED on June 3, 2026, at Houston, Texas.

_____
Lee H. Rosenthal
Senior United States District Judge