**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| | § | |
| **VS.** | § | **CRIM. NO. H-26-023** |
| | § | |
| **JOHN STEVENSON BYNON, JR.** | § | |

**UNITED STATES' MOTION FOR RECONSIDERATION ON PRELIMINARY RULINGS AND SUPPLEMENTAL BRIEFING ON MOTIONS IN LIMINE**

Defendant John Stevenson Bynon, Jr. ("Bynon") filed an omnibus motion in limine on August 15, 2026. (Docket No. 137.) The parties appeared before the Court three days later at a motion hearing and pretrial conference. (Docket No. 150.) The Court granted Bynon's motion in limine in part and requested supplemental briefing regarding the admissibility of evidence that remained in dispute following the August 18, 2026 hearing. (Docket No. 151.) For the reasons set forth below, the United States respectfully requests that the Court reconsider its prohibition of patient testimony, preclusion of the words "lies" and "deception," and two-part jury instruction regarding 42 C.F.R. § 482.94. The United States also submits a supplemental memorandum of law regarding admission the MPSC investigation and motive.

**I. Factual Background**

Bynon served as the Director of Abdominal Organ Transplantation and Surgical Director for Liver Transplantation at Memorial Hermann Health System (MHHS) Texas Medical Center (TMC). His tenure as the primary surgeon for MHHS TMC began in 2011 and continued until 2024, when the MHHS transplant program was temporarily inactivated and found to be a member not in good standing following allegations of waitlist manipulations.

## A. Transplant Coordinator and Treating Physician Testimony

In March 2024, MHHS's kidney and liver transplant programs were reviewed by the Organ Procurement Transplantation Network ("OPTN")[1] Membership and Professional Standards Committee ("MPSC")[2] after anonymous reporting alleged that Bynon manipulated the waitlist for patients awaiting transplant surgery. The MPSC is a key operating committee of OPTN, with a mandate to monitor and uphold standards across the United States transplant system. Members include transplant clinicians, professionals, and regional representatives—typically volunteers serving two or three year terms. A typical membership body is comprised of transplant surgeons, physicians, HRSA[3] representatives, and UNOS staff. After conducting an investigation, the OPTN advised MHHS to voluntarily inactivate its liver and kidney transplant program on April 3, 2024, to mitigate an urgent and severe risk to patient safety.

After the inactivation, MHHS agreed to a peer review team visit on May 21-22, 2024,

---

[1] The OPTN is led by a board of directors with representatives from "organ procurement organizations ["OPOs"], transplant centers, voluntary health associations, and the general public." 42 U.S.C. §§ 274(a)-(b)(1)(B). This entity maintains "a national list of individuals who need organs [. . .] through the use of computers and in accordance with established medical criteria." 42 U.S.C. §§ 274(b)(2)(A)(i)-(iii). The United Network for Organ Sharing ("UNOS") is a private non-profit organization, serving as the sole OPTN contractor since 1986. *Callahan v. United States HHS Through Alex M. Azar II*, Case No. 19-1783, 2024 U.S. Dist. LEXIS 245145, at *7 (N.D. Ga. July 8, 2024).

[2] The MPSC is "a standing OPTN committee charged with reviewing and evaluating whether OPTN members meet and remain in compliance with OPTN obligations [. . .] The MPSC monitors members for compliance with OPTN obligations and views reported violations." *See* Organ Procurement and Transplantation Network Bylaws, p. 219. The OPTN Bylaws provide that:

> When the OPTN becomes aware of a member's potential noncompliance with OPTN Obligations, the OPTN will conduct an investigation. This investigation will evaluate whether a potential noncompliance exists. The investigation will also consider whether the potential noncompliance suggests a risk to patient health or public safety, and the urgency and severity of the risk. Members must respond to all investigation requests within the specific period. A member may provide any information that it believes is relevant to the investigation. The OPTN will notify the member of the date by which the member must submit the requested or additional information.

*Id*. at p. 196.

[3] The Health Resources and Services Administration ("HRSA") is an agency within the HHS, responsible for organizing and administrating "organ procurement activities." 42 U.S.C. § 274c.

during which, MPSC members interviewed staff and reviewed medical records, policies, protocols, transplant data, and safety culture. This MPSC review team consisted of four medical professionals including surgical and medical directors of different transplant programs across the country, two HRSA representatives, and three UNOS staff members. The investigation concluded that Bynon's donor acceptance manipulations were highly irregular, unsupported, and inconsistent with liver transplant practice.

Patients were referred to MHHS for a liver transplant evaluation when their doctors deemed it was necessary for their health and/or survival. Upon referral, each patient underwent extensive evaluation, including medical history review, procedures required for listing, insurance authorization, psychological assessment, bloodwork, and imaging. Once deemed ready, patient cases were reviewed by the Multi-Disciplinary Review Board ("MRB"), a committee composed of transplant surgeons, hepatologists, coordinators, nurses, billing administrators, and a psychiatrist. When approved, the transplant coordinator entered standard broad donor acceptance parameters to activate the patient on the UNOS waitlist. It was imperative that the parameters were broad to ensure that a patient would receive as many organ offers as possible, as the more organs offered has a direct correlation with the likelihood of transplant. UNOS entries for listing potential transplant recipients were detailed, encompassing an exhaustive list of patient medical information that included donor acceptance criteria. After listing, patients continued to undergo procedures and monitoring in anticipation of receiving an organ and to remain active on the waitlist. Despite knowing that the patients identified in Counts 1–5 of the Superseding Indictment were properly approved and listed, Bynon secretly altered their donor acceptance criteria to create near impossible match conditions. Donor acceptance criteria are commonly broad and not often

changed after initial listing on "UNet." The "UNet" computer program[4] is maintained on a platform separate and distinct from the patient's medical chart, also known as "Transchart."[5] Thus, a routine review of Transchart would not reveal the patient's donor criteria unless a member of the transplant team affirmatively entered this information on the patient's chart.

Furthermore, Bynon did not issue an "internal hold" or assign a Status 7 to the patient file – both of which are transparent methods of preventing a patient from getting a liver organ offer and is communicated and documented. An internal hold is noted in the patient's chart, the patient is notified, and the ***entire*** transplant team is aware that, for a reason that is being actively resolved by this team, (*i.e.* billing issues, patient health issue) that patient should not receive any organ offers; these are typically brief holds and are reviewed in the next weekly MRB meeting. A Status 7 is a formal inactivation from the waitlist that is decided and reviewed by the transplant team in the MRB: If a Status 7 is agreed upon, the patient is formally inactivated from the waitlist until further notice. Again, in this circumstance, the patient is notified, and the decision is properly documented in the patient's record. Here, Bynon imposed extreme, unjustified restrictions that functionally prevented these patients from receiving liver offers. These unilateral changes were hidden from patients, their families, the MRB, and all treating physicians, depriving the patients of access to potentially lifesaving organs.

The treating physicians, all experienced transplant specialists and surgeons, will testify that shortly after joining the MHHS transplant program, they began noticing that their patients were

---

[4] UNet is a technology used to match organ donors and patients in need of organs. UNet maintains a list of patients in need of transplants. *See* UNOS Technology, ("UNet[SM] links all 55 organ procurement organizations, 254 transplant hospitals and 150 histocompatibility labs in the U.S., and enables donation and transplant professionals to make lifesaving decisions with speed and efficiently.") (available at https://unos.org/technology/) (last visited May 24, 2026). "DonorNet" is the corresponding computer program for organ donors. The UNET computer program has its own log in system for the entry of donor acceptance criteria such entries are considered part of a patient's medical chart. The footprint for logging into the program is specific for each patient.

[5] MHHS medical charts are referred to as Transcharts.

not receiving liver offers. They later discovered that the cause of this phenomenon wasBynon's false statements and misrepresentations regarding the Medical Review Board's decisions to activate patients. Upon reviewing the UNet system, the physicians confirmed that Bynon had manipulated donor acceptance criteria, which effectively inactivated several of their patients. The physicians raised these concerns with their senior leadership at UT Health on multiple occasions in late 2023. They reported the issues to Dr. Adrassy, Chair of the Department of Surgery and Senior Vice President of Clinical Affairs and Strategy, and to Dr. Colassurdo, President of UT Health. However, their concerns were dismissed.[6]

**B. Patient Summaries**

Through these repeated unilateral false statements and misrepresentations of the MRB decision to actively list a patient, Bynon obstructed the transplant process, concealed critical medical information, and deprived multiple patients of access to donor organs, in violation of 18 U.S.C. § 1035, professional standards, federal requirements, and the patient rights of those under his care. The transplant physicians, nurses, coordinators, and other professionals will testify that they all worked in treating these patients under the belief that they were active candidates on the waitlist.

For Patient C.C., the MRB approved his transplant candidacy and activation occurred on March 22, 2023. The broad donor acceptance criteria entered by the transplant coordinator was a local maximum and minimum acceptable donor age of 0 to 80 years old and a maximum and minimum acceptable donor weight of 70 to 300 pounds. On August 12, 2023, without justification,

[6] According to the MPSC findings (pages 10–11), UT Health leadership demonstrated an inability or unwillingness to address concerns raised by junior faculty, showed a lack of accountability regarding faculty and transplant program issues, and repeatedly attributed the problems solely to "poor communication" rather than acknowledging the broader culture of intimidation, harassment, and threats described by the physicians.

without documentation, and without informing the care team, Bynon covertly altered and entered false statements that the patient's donor age and weight criteria to a maximum and minimum acceptable donor age of 0 to 8 years old and a maximum and minimum acceptable donor weight of 70 to 200 pounds, effectively removing the patient from meaningful transplant consideration for approximately 149 days. By entering this false data, Bynon misrepresented the MRB's decision to activate this patient on the waitlist. Neither the patient, the patient's family, nor treating transplant team providers were aware that Defendant had rendered the patient ineligible. During this time, the care team performed appointments and treatments, as if the patient was actively listed for transplant. Patient C.C. did not receive a liver and died at MHHS awaiting a liver transplantation.

For Patient A.P., the MRB approved his transplant candidacy and activation occurred on February 13, 2024. The broad donor acceptance criteria entered by the transplant coordinator was a local maximum and minimum acceptable donor age of 0 to 80 years old and a maximum and minimum acceptable donor weight of 70 to 300 pounds. The very next day, without justification, without documentation, and without informing the transplant team, Bynon covertly entered false criteria and changed the maximum and minimum acceptable donor age to 0 to 8 years old, severely restricting the patient's eligibility for approximately 38 days. By entering this false data, Bynon misrepresented the MRB's decision to activate this patient on the waitlist. Again, neither the patient, the patient's family, nor treating transplant team providers were informed of Bynon's actions. Patient A.P. did not receive a liver at MHHS but did receive a transplant at St. Lukes when the MHHS transplant program ceased operations.

For Patient R.O., the MRB approved his transplant candidacy and activation occurred on February 10, 2023. The broad donor acceptance criteria entered by the transplant coordinator was

a local maximum and minimum acceptable donor age of 0 to 80 years old and a maximum and minimum acceptable donor weight of 70 to 300 pounds. Without justification, without documentation, and without informing the care team, on July 3, 2023, Bynon unilaterally changed and entered false data of multiple donor criteria including maximum and minimum acceptable donor age to 0 to 6 years old and maximum and minimum acceptable donor weight to 150 to 200 pounds, effectively preventing the patient from receiving an offer for approximately 69 days. By entering this false data, the defendant misrepresented the MRB's decision to activate this patient on the waitlist. Bynon concealed these actions from the patient, the patient's family, and the entire care team. Patient R.O. did not receive a liver and died at MHHS awaiting a liver transplant.

For Patient P.P., the MRB approved her transplant candidacy and activation occurred on April 25, 2023. The broad donor acceptance criteria entered by the transplant coordinator was a local maximum and minimum acceptable donor age of 0 to 80 years old and a maximum and minimum acceptable donor weight of 70 to 300 pounds. Without justification, without documentation, and without informing the transplant team, on November 5, 2023, Bynon again covertly entered false data that imposed excessively restrictive donor age and weight criteria to a maximum and minimum acceptable donor age of 0 to 6 years old and a maximum and minimum acceptable donor weight of 70 to 200 pounds, rendering the patient functionally ineligible for approximately 143 days, without informing anyone responsible for the patient's care. By entering this false data, Bynon misrepresented the MRB's decision to activate a patient on the wait list. Patient P.P. did not receive a liver at MHHS but did receive a transplant at Houston Methodist Hospital when the MHHS transplant program ceased operations.

Finally, for Patient O.F., the MRB approved her transplant candidacy and activation occurred on December 23, 2023. The broad donor acceptance criteria entered by the transplant

coordinator was a local maximum and minimum acceptable donor age of 0 to 80 years old and a maximum and minimum acceptable donor weight of 70 to 300 pounds. Without justification and without informing the transplant team, less than one day later, Bynon altered and entered false data of donor age and weight criteria to a maximum and minimum acceptable donor age of 0 to 8 years old and a maximum and minimum acceptable donor weight of 70 to 250 pounds. By entering this false data, the defendant misrepresented the MRB's decision to activate this patient on the waitlist. The patient remained ineligible for the remainder of the patient's life. Patient O.F. did not receive a liver and later died at MHHS awaiting a liver transplantation.

### C. Patient and Beneficiary Testimony

The United States intends to elicit testimony from patients and family members establishing that they relied on representations from the transplant team that they were active on the UNOS waitlist. They relied on the transplant team, underwent numerous procedures, and waited in constant anticipation for donor organs—never to know they had been secretly rendered ineligible. As a result of Bynon's false statements and misrepresentations, they were denied a healthcare benefit approved by Medicare or Medicare Advantage due to Defendant's misrepresentations and false entries.

### D. Dr. Raymond Lynch: Overview of OPTN and SRTR Data Evidence

Congress enacted the National Organ Transplant Act in 1984 ("NOTA"), assigning oversight of organ procurement and allocation to the Secretary of the United States Department of Health and Human Services ("HHS"). *See* 42 U.S.C. §§ 273-274e. HHS subsequently created the Organ Procurement Transplantation Network. 42 C.F.R. § 121.3(c)(1). The OPTN is responsible for maintaining a national registry to facilitate organ matching and is operated by a private organization under federal contract. Since its inception, that contract was continuously awarded

to the United Network for Organ Sharing, a private nonprofit organization authorized pursuant to 42 C.F.R. § 121. UNOS manages the U.S. organ transplant system, including the national waiting list, donor–recipient matching, maintenance of transplant data, enforcement of allocation policies, and public education regarding organ donation. Through UNet, patient medical data—including immunologic factors and physical donor–recipient matching parameters such as donor size and weight—are entered to determine appropriate organ matches. These criteria significantly influence a patient's ability to receive a donor organ and the likelihood of a successful transplant.

The Scientific Registry of Transplant Recipients ("SRTR") is a national database that collects, analyzes, and reports data regarding organ transplantation in the United States. As described by the Health Resources and Services Administration, SRTR's mission is to provide advanced statistical and epidemiological analyses related to solid organ allocation and transplantation in support of the Department of Health and Human Services and its designated oversight agencies. Comparable to the contractual relationship between the United Network for Organ Sharing and the federal government for operational support of the Organ Procurement and Transplantation Network, SRTR is likewise contracted to provide analytical support and assist in the formulation and evaluation of OPTN policies.

In addition to providing metrics to the federal government, SRTR supplies transplant programs, candidates, donors, recipients, and families with outcome-based data necessary to make informed decisions regarding transplant care. SRTR data is used by both the OPTN Membership and Professional Standards Committee and the Centers for Medicare & Medicaid Services ("CMS") in exercising their oversight responsibilities, including determining when a transplant program requires heightened review. Private insurance providers also rely on SRTR statistics.

Private insurers evaluate SRTR data to designate certain hospital transplant programs as

"Centers of Excellence."[7] Insurers may require a patient to utilize one of these designated programs as a condition for full coverage of a transplant procedure. Due to the complexity and cost of organ transplantation, major insurers rely on SRTR's outcome metrics to determine which programs provide the most reliable and effective care. Memorial Hermann Health System held a Center of Excellence designation from private insurers during Bynon's tenure at his hospital.

Because Bynon repeatedly and covertly imposed donor acceptance restrictions that rendered certain patients functionally inactivate while still formally listed, those patients' organ offers remained within SRTR's data calculations. However, due to the imposed criteria, these patients were effectively unable to receive any offers. As a result, the MHHS donor acceptance rate appeared artificially high and did not reflect actual clinical performance. Dr. Raymond Lynch, Director of the Division of Transplant within HRSA, which oversees OPTN and its contractors including the SRTR contractor, confirmed that MHHS's SRTR metrics were inconsistent with expected clinical outcomes. In his report, Dr. Lynch stated:

> Cumulatively, SRTR metrics for the period from the middle of 2020 through the inactivation of the program in 2024 show worse than expected rates of transplant and death for patients on the liver transplant waitlist at TXHH, despite expected or higher-than-expected offer acceptance rates. The discrepancy between patient outcomes and offer acceptance patterns could reflect unmodeled confounding factors that differ between TXHH patients and patients listed at other programs; alternatively or additionally, the discrepancy could reflect a systematic difference in the number of organ offers made to TXHH patients, which could inflate the offer acceptance rate relative to the mortality and transplant rates.

*See* Dr. Raymond J. Lynch, Assessment of the Liver Transplant Waitlist Practices Involving Memorial Herman Health System (OPTN Code TXHH)/Dr. John Stevenson Bynon, pg. 11 (June 7, 2026). In summary, worse-than-expected waitlist mortality and transplant rates should correlate with lower donor acceptance rates. MHHS's unusually high acceptance rates did not account for

---

[7] *See* FBI reports (302's) provided to the defendant in discovery under bates numbers USA3394119-USA3394120, Production Volume 30 and USA3397122-USA3397123, Production Volume 34.

Bynon's undisclosed manipulation of donor acceptance criteria. Consequently, private insurers and federal oversight bodies relying on SRTR's data for program evaluation and payment determinations were materially misled regarding MHHS's true transplant performance.

### E. MPSC and MHHS Employee Testimony

The chair of the MPSC and/or an employee from MHHS will testify that the "Center of Excellence" designation was critical for private insurers and was not valid after the program shut down in 2024. The donor acceptance criteria manipulations executed by Bynon caused numerous MHHS patients to endure prolonged periods without receiving organ offers. SRTR includes donor offer and acceptance data as a key performance metric, specifically measuring whether a program accepts organ offers at rates consistent with national expectations. This metric informs patients evaluating transplant programs, oversight bodies responsible for maintaining equitable allocation standards, and private insurers determining which programs meet contractual excellence criteria. Between 2019 and 2024, MHHS performed 150 liver transplants while the defendant served as the program director. Of these procedures, 96 were paid for by private insurance or foreign embassies, while only 54 were paid for by public insurance such as Medicare. Exhibit 1[8] summarizes all liver transplants performed during this period. The witness will further discuss that the average payment for private insurance payout is significantly higher than Medicare reimbursement.

## II. Procedural Background

Bynon requests that the Court: (1) limit patient testimony to "matters within their personal knowledge," (2) preclude testimony "about what the patients would have done had they been told" that Bynon functionally removed them from the transplant waitlist, (3) exclude photos of the

[8] Exhibit 1 is an MHHS document produced to the defendant in discovery under bates numbers USA1345163-USA1345168, Production Volume 13.

patients, (4) preclude the use of the word "victim," (5) preclude witnesses from referring to donor criteria as "lies" or "deceptions," (6) exclude evidence of the 2024 MPSC investigation, (7) preclude evidence portraying Bynon as "autocratic and vindictive," and (8) preclude "unsupported suggestions of personal-financial motive." (Docket No. 137.)

At the August 18, 2026 hearing, the Court held that "three of the forbidden words here are 'lies,' 'deceptions,' and 'victims.'" Ex. 2, p. 159 (Hearing Transcript). The Court also ruled that if "the government attempts to use this – refer to [42 C.F.R. § 482.94], I would instruct the jury, at a minimum, that as a matter of law, Dr. Bynon did not violate [. . .] the regulation by failing to inform the patients that he placed then on an internal hold. Didn't violate it." *Id*. at p. 120. The Court reserved judgment and requested that the parties submit supplemental briefing regarding evidence that remained in dispute following the motion hearing.

## III. Motion for Reconsideration on Preliminary Rulings

The United States requests that the Court reconsider: (1) exclusion of patient testimony, (2) the "lies" and "deception" prohibition, and (3) the jury instruction regarding Section 482.92. "While the Federal Rules of Criminal Procedure do not provide for a motion for reconsideration, . . . the Supreme Court has 'concluded that motions to reconsider in criminal prosecutions are proper and will be treated just like motions in civil suits.'" *United States v. E.I. Du Pont De Nemours and Co.*, 622 F. Supp. 3d 450, 467 (S.D. Tex. 2022) (J., Rosenthal) (quoting *United States v. Rollins*, 607 F.3d 500, 502 (7th Cir. 2010)). A motion for reconsideration "must clearly establish either a manifest error of law or fact or must present newly discovered evidence" and "cannot be used to raise arguments which could, and should, have been made before the judgment issued" or "to argue a case under a new legal theory." *Simon v. United States*, 891 F.2d 1154, 1159 (5th Cir. 1990) (internal quotation marks and citation omitted). Courts construe "such motions in

criminal matters like motions to reconsider in civil suits." *United States v. Dibiase*, Case No. 23-035, 2026 U.S. Dist. LEXIS 27039, at *2 (S.D. Miss. Feb. 10, 2026) (citing *United States v. Lynn*, Case No. 90-053, 2023 U.S. Dist. LEXIS 239538, at *1 (S.D. Miss. Feb. 24, 2023).

**A. Patient Testimony**

The United States requests the Court to reconsider its prior limine order regarding named patient testimony, and to deny Bynon's latest attempt to entirely exclude patient testimony from consideration by the jury. (Docket No. 137.) This Court previously entered a limine order "precluding counsel, the parties, and witnesses from mentioning the patients' subsequent adverse health events, transplants, or deaths, and evidence that Dr. Bynon made certain medical decisions unilaterally, without first approaching the bench outside the venire's or the jury's presence and obtaining leave to do so." *United States v. Bynon*, 834 F. Supp. 3d 728, 748 (S.D. Tex. 2026). Dr. Bynon now seeks to entirely exclude patient testimony.

The parties concur that patient testimony "should be confined to matters they actually perceived that bear on an element of § 1035(a)(2)." (Docket No. 137 at p. 4.). However, according to Bynon, "[n]one exists." *Id*. He asserts that "[n]othing about [the 18 U.S.C. § 1035] elements turns on how the five patients or their families felt, [or] what became of them medically…" and that the [patients did not make, hear, see, or participate in the entries at issue." *Id*.

The fact that the named patients were not involved or informed of the (circumstances surrounding the) entries at issue is precisely why their testimony is relevant and should be considered by the jury at trial. A patient's exclusion from the medical decision-making regarding their medical care is relevant as evidence of falsity, intent, and materiality.

Bynon has maintained that his false statements in this matter stemmed from his medical judgment regarding the patients' viability for an organ transplant. Each patient purportedly had a

change in medical condition that rendered them inviable for a successful liver transplant during the period Bynon falsely changed their criteria in the UNet system to prevent an organ transplant match. He essentially argues that what he did was in the best interest of each patient affected by his false statement.

Why would Bynon not want the patients to testify in a case involving the delivery of healthcare benefits? If Bynon was acting in the best interest of each patient, why wasn't the patient (or anyone else) informed about the action? If the patient was no longer viable for an organ transplant due to a change in condition, why wasn't the patient (or anyone else) informed about this change in viability?

Bynon offers an answer to these question in his motion in limine: "Whether Dr. Bynon acted deceptively, indifferently, or for an improper reason is the willfulness element [of the charged offense]. It is not something a patient perceived." (Docket No. 137 at p. 5.) The patient testimony that the United States intends to adduce at trial is evidence of "willfulness" and tethers the false statements to "the delivery of healthcare benefits" element of the alleged offense, and as such, is admissible.

The United States agrees that patient testimony "should be confined to matters they actually perceived that bear on an element of § 1035(a)(2)." (Docket No. 137 at p. 4.) A patient would know if the circumstances given rise to this matter were in the delivery of a healthcare benefit, *i.e.*, a liver organ transplant. A patient would know if they were told that they were eligible for an organ transplant. A patient would know if they were told that they were inviable for an organ transplant. A patient would know if they were consulted about other medical options besides rendering them functionally inactive in the liver transplant match system. A patient would know if they felt worse or a change in their condition, even if they did not know (and could not testify to) the medical

diagnosis or condition underlying the worsened or changed condition.

In addition to the required elements of the offense, the fact that a patient did not know about a purported medical treatment (*i.e.*, withholding an organ match) administered by their transplant surgeon as part of his purported medical judgment is relevant to a juror's consideration of whether the surgeon's conduct was in fact the application of medical judgment as a defense. If the customary practice is for a patient to remain informed regarding their medical condition and treatment, then the deviation and concealment regarding their medical assessment and treatment is relevant (even if not dispositive) regarding the willfulness of the deviated and concealed conduct, *and* whether the conduct truly aligned with medical judgment to (clandestinely) aid the patient.

The United States anticipates that the named patients or their representative will testify to the following: 1) the patient was under the care of Bynon for a liver transplant procedure; 2) the patient was made to undergo extensive testing and evaluation before placement on the liver transplant list to determine their eligibility and viability for a transplant; 3) the patient was informed by the medical staff that the patient qualified for a liver transplant and was being placed on the list for a liver transplant match; 4) the patient was required to undergo regular evaluations and maintenance while on the transplant waitlist to ensure their continued eligibility and viability for a liver transplant; 5) the patient was never informed that there was a concern regarding their medical condition and/or ability to receive a liver transplant after being placed on the list; 6) the patient was never informed that they were functionally deactivated by Bynon while they were on the liver transplant waitlist; and 7) in some cases, Bynon specifically told them he anticipated them receiving an organ transplant "any day" during the period in which they were functionally deactivated from receiving a liver transplant match.

The testimony of the patients is relevant to specific elements of the charged offense and Bynon's proffered defense that he was acting in the best interest of his patients in using his medical judgment at the time of the false statements and should be considered by the jury in their deliberation of this matter.

**B. Lies and Deception**

Bynon's in limine motion seeks an order prohibiting government witnesses from "characterizing the donor-acceptance criteria adjustment as 'lies,' "lying.' 'manipulations' 'deception, or 'fraud,' or opining or speculating that Dr. Bynon acted improperly, deceptively, or with knowledge of wrongdoing." (Docket No. 137 at p. 13.) It also requests that the Court preclude the United States from "using those characterizations during voir dire and opening statement, before any evidence has been received." *Id*. The Court subsequently ordered the United States not to say the words "lies," "deceptions," and "victims" at trial. Ex. 2 at p. 159.

Precluding the United States from referring to donor criteria as a "lie" and/or "deception" attempts to shield Bynon from "characterizations" that are inherent in every false statement prosecution. To sustain a conviction on the Section 1035 counts, the United States must prove that "(1) the defendant made a materially false, fictitious, or fraudulent statement or misrepresentation; (2) in connection with the delivery of [or payment for] health care benefits; and (3) [he] did so knowingly and willfully." *United States v. Hamilton*, 37 F.4th 246, 260 (5th Cir. 2022) (citing *United States v. Dailey*, 868 F.3d 322, 330 (5th Cir. 2017)). This statute is titled, "***False*** statements relating to health care matters." 18 U.S.C. § 1035 (emphasis added). Indeed, the United States intends to prove beyond a reasonable doubt that Bynon ***lied*** by entering false donor criteria. "The meaning of the word 'lie' includes to 'tell an untruth' or to 'speak or write falsely.'" *PBM Prods., LLC v. Mead Johnson & Co*., 639 F.3d 111, 119 (4th Cir. 2011) (quoting Black's Law

Dictionary, 1005 9th Ed. 2009); *cf Maslenjak v. United States*, 582 U.S. 335, 338 (2017) ("While the illegal act is a false statement, that means demonstrating that the defendant ***lied*** about acts that would have mattered to an immigration official, because they would have justified denying naturalization or would predictably have led to other facts warranting that result.") (emphasis added); *United States v. Vinaykumar Patel*, Case No. 24-1798, 2025 U.S. App. LEXIS 13595, at *4 (3rd Cir. June 3, 2025) ("[Viewing] the evidence in the light most favorable to the government, the jury had sufficient evidence to find that Patel had 'knowingly and willfully' ***lied*** to medical professionals about having anxiety.") (citing 18 U.S.C. § 1035(a)(2)) (emphasis added). Deception is an apt description for concealing critical information from patients and the transplant team, evidence that Bynon falsified donor criteria with willful intent. The United States seeks leave to use the words "lies" and "deceptions" at trial because these words convey the same meaning as the statutory language.

**C. Jury Instruction Regarding 42 C.F.R § 482.94**

The Court informed the parties that the instruction regarding 42 C.F.R. § 482.94 is "really two parts." Ex. 2 at p. 122. "Number one, that violation wasn't violated. Number two, violation[] of a regulation, without more, is not a crime." *Id.* The United State concedes that this second instruction is appropriate. It requests, however, that the Court allow the jury to determine whether Bynon complied with this regulation. Whether Bynon violated this regulation is a question of fact for the jury to resolve. *See, e.g.*, *Goodman v. United States*, 518 F.2d 505, 511 (5th Cir. 1975) ("Because violation of the Act or regulations is essentially a question of fact, the district court must review the storeowner's evidence, as well as the Government's, to ascertain whether the agency's determination is supported by the facts."). For instance, the jury may find that Bynon circumvented the notification requirements set forth in this regulation and that doing so

contravened the purpose of C.F.R. § 482.94.

## IV. Supplemental Memorandum of Law

The following memorandum of law pertains to the MPSC report and evidence of financial gain.

### A. The MPSC Investigation and Report

The United States seeks to admit evidence of the 2024 MPSC investigation for two reasons. First, Bynon changed donor criteria after MHHS received a letter from the OPTN concerning "donor acceptance criteria [that] has been changed for multiple liver candidates to effectively inactivate candidates without changing their status to inactive." The OPTN expressed "a very serious concern for patient equity and safety," requesting that MHHS leadership and members of the transplant program participate in an "informal discussion." The day after MHHS received this letter, Bynon modified A.P.'s UNet profile by expanding the pool of prospective donors, entering the following criteria: Age, 0-60 years old; Weight, 70-200 pounds. Bynon's abrupt modification demonstrates a consciousness of guilt and undermines the proposition that A.P. was ineligible for transplantation: The evidence suggests that Bynon restricted donor criteria for reasons other than his clinical judgment by anchoring donor criteria to external considerations (*i.e.* to stymie a government investigation). *See, e.g.*, *United States v. Patel*, 485 Fed. Appx. 702, 709 (5th Cir. 2012) ("[There] was evidence that Patel abruptly changed course, evincing possible consciousness of guilt, after the government executed its search warrant.").

Second, the United States intends to admit statements that Bynon made to MPSC investigators on March 28, 2026 as an admission by a party opponent. *See* Fed. R. Evid. 801(d)(2) ("An admission by a party-opponent is not hearsay if "the statement is offered against a party and is [. . .] the party's own statement in either an individual or a representative capacity."). These

statements demonstrate that Bynon was the only member of the transplant team to deactivate patients by entering restrictive donor criteria. He cites instances of "internal holds" to legitimize his actions, implying that his peers routinely restricted donor criteria. However, Bynon's own statements belie this assertion. During the MPSC investigation, Bynon stated:

> I fully admit that I manipulated weight and age listings in our liver transplant waiting list to limit organ offers in certain patients at certain times. **This was used as a mechanism by me and only me for internal hold on.**

Informal Discussion Video (Mar. 28, 2026) (10:35 through 10:54) (emphasis added). The MPSC investigation will provide context for the jury to assess Bynon's statements at the information discussion.

The MPSC issued a report in May 2024. *See* Ex. 3. The United States seeks to admit a redacted version of this report at trial. *See* Ex. 4. The MPSC investigation falls within the public-records hearsay exception set forth in Federal Rule of Evidence 803(8). This rule provides that public records are not hearsay if:

> (A) It sets out:
>
> (i) The officer's activities;
>
> (ii) A matter observed while under a legal duty to report, but not including in a criminal case, a matter observed by law-enforcement personnel; or
>
> (iii) In a civil case or against the government in a criminal case, factual findings from a legally authorized investigation and
>
> (B) the opponent does not show that the source of information or other circumstances indicate a lack of trustworthiness.

Fed. R. Evid. 803(8). The public-records exception to the hearsay prohibition is based on "the assumption that a public official will perform his duty properly and the unlikelihood that he will remember details independently of the record." *Sherrill v. Aziyo Biologics, Inc.*, Case No 21-172, 2024 U.S. Dist. LEXIS 202417, *3-5 (W.D.N.C. Nov. 6, 2024) (quoting *Ellis v. Int'l Playtex, Inc.*,

745 F.2d 292, 300 (4th Cir. 1984)); *United States v. Wiley*, 979 F.2d 365 369 (5th Cir. 1992) (affirming the admission of an IRS report in a criminal prosecution pursuant to Rule 802(8)). Medical professionals authored the MPSC report, experts in their respective fields with no incentive to misconstrue their findings or bias toward Bynon. These volunteers were simply tasked with determining whether MHHS complied with OPTN policy.

In *Beech Aircraft Corp. v. Rainey*, the Supreme Court adopted an expansive interpretation of Rule 803(3), holding that "evaluative reports" in addition to "factual" statements fall within the purview of this exception. 488 U.S. 153, 166-67 (1988) (affirming the admission of a JAG report at trial, holding that "portions of investigatory reports otherwise admissible under Rule 803(8)(C) are not inadmissible merely because they state a conclusion or opinion. As long as the conclusion is based on a factual investigation and satisfies the Rule's trustworthiness requirement, it should be admissible along with other portions of the report"); *see, e.g.*, *Shepherd v. Dallas County*, 591 F.3d 445, 457-58 (5th Cir. 2009) (affirming the admission of a Department of Justice report on an investigation of health care at Dallas County Jail pursuant to Rule 803(8)); *see also* 30B Charles Alan Wright, Federal Practice and Procedure § 6882 (2023 ed.) (noting that Rule 803(8) applies to federal offices and agencies).

The MPSC report is trustworthy, reliable and not testimonial. This investigation examined whether MHSS complied with OPTN policy, not whether Bynon violated a criminal statute. The statements made by Bynon and other members of the transplant team were not "made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." *Crawford v. Washington*, 541 U.S. 36, 51-52 (2004). "[A] statement that is not testimonial cannot violate the Confrontation Clause." *United States v. Vasquez*, 234 F. App'x 310, 313 (5th Cir. 2007) (unpublished) (per curiam) *accord Davis v.*

*Washington*, 547 U.S. 813, 823-24 (2006) (holding that "the Confrontation Clause applies only to testimonial hearsay" because "[a] limitation so clearly reflected in the text of the constitutional provision must fairly be said to mark out not merely its 'core,' but its perimeter"). Indeed, the Fifth Circuit has held that public records are not testimonial. *See United States v. Lopez-Moreno*, 420 F.3d 420, 437 (5th Cir. 2005).

Bynon contends that Rule 803(8) is only applicable in "a civil case or against the government in a criminal case." (Docket No. 137 at p. 14.) He cites no authority in support of this proposition. Courts have, however, permitted the United States to admit evidence in a criminal action pursuant to Rule 803(8). *See, e.g., United States v. Rosa*, 11 F.3d 315, 331 (2d Cir. 1993) ("[We] hold that medical examiners' reported observations are admissible under Rule 803(8)(B)" against the defendant in a criminal prosecution). Because the portions of the report that the United States seeks to admit fall within the hearsay exception set forth in Rule 803(8), it seeks leave of the Court to admit this evidence at trial.

**B. Evidence of Personal (Financial) Gain**

The United States maintains that Bynon's personal motivation is not an element of 18 U.S.C. § 1035. As such, the United States asserts that evidence surrounding Bynon's motivation is irrelevant (and arguably, improper) for the prosecution to solicit for the jury's consideration in this matter.

However, to the extent that Bynon raises (the absence of) motive evidence before the jury, the United States believes it should be allowed to offer relevant evidence on this matter. As stated during the August 18, 2026 hearing, only Bynon truly knows his motive for his false statements. It was customary in the transplant process at Memorial Hermann Hospital for the MRB to evaluate transplant patients in an open and collaborative discussion regarding a patient's course of

treatment, including the rationale for said treatment. If a formal meeting did not occur, the evidence will show that it was customary for Bynon and others to create an ad hoc meeting for a patient, even if by text messages or emails, collaboratively discussing a course of treatment for a patient. Additionally, it was customary to document medical assessments and treatments in a patient's medical records, further illuminating the reasoning behind a medical course of conduct for a particular patient. The instant matter has neither layer of transparency regarding Bynon's election to enter false criteria statements for the named patients. Each patients' medical record omitted any mention of the change regarding their liver match criteria and/or the reasoning for the change. Thus, only Bynon truly knows his motivation for the false criteria statements.

While the government's witnesses cannot testify regarding Bynon's specific motivation(s) regarding the false statements, the witnesses can testify regarding trends and benefits observed that coincided or resulted from the false statements. For example, medical staff will testify that a wholistic review of Bynon's criteria manipulations for the named patients and others reflect that criteria manipulations without medical documentation often occurred when Bynon was not the on-call surgeon, was on vacation, and/or otherwise did not want to be called into work. Additionally, hospital staff can testify that Bynon's salary of approximately $1,000,000 annually was based on his management of the liver transplant program at Memorial Hermann Hospital. The staff can testify that the customary means of declining a transplant organ required medical personnel rejecting an organ after it was matched to a patient, which increased a program's rejection rate. This rejection rate is measured and recorded as a hospital evaluation metric and can impact a program designation as a "Center of Excellence." The staff will state that Bynon's criteria manipulation resulted in a low organ declination rate (because there was no match to reject), which positively contributed to the program's excellence designation. While the United States does not

believe this information is relevant in its case as charged, the United States would anticipate offering testimony on these possible motives if Bynon makes motivation an issue at trial.

## V. Conclusion

For the reasons set forth above, the United States respectfully requests that the Court reconsider its prohibition of patient testimony, preclusion of the words "lies" and "deception," and two-part jury instruction regarding 42 C.F.R. § 482.94. The United States also submits a supplemental memorandum of law regarding admission the MPSC investigation and motive.

Respectfully Submitted,
AARON F. REITZ
United States Attorney

Southern District of Texas
By: */s/ Amanda Alum*
Amanda Alum
Suzanne Elmilady
Sherin Daniel
Anthony Franklin
Assistant United States Attorney
1000 Louisiana, Suite 2300
Houston, Texas 77002
Telephone (713) 567-9000

**CERTIFICATE OF SERVICE**

I certify that a true and correct copy of the foregoing has been delivered on counsel of record via ECF upon filing.

*/s/ Amanda Alum*
Amanda Alum
Assistant United States Attorney